UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

**Andre Winston,**

        Plaintiff,

        vs.                        04-1079

**Brandy CMT, et al.,**

        **Defendants**

### ORDER

Before the court are the defendant, Dr. Arthur Funk's summary judgment motion, d/e 87, and the plaintiff's response.

### Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Herman v. National Broadcasting Co., Inc.,* 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied,* 470 U.S. 1028 (1985). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988). A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986).

### Background

1

In his amended complaint, the plaintiff seeks money damages for deliberate indifference against Defendant, Dr. Arthur D. Funk. The Plaintiff claims that: 1) Dr. Funk was indifferent to his medical need since he transferred to Pontiac Correctional Center on October 16, 2002, by not immediately placing Mr. Winston on the chronic illness list; 2) Dr. Funk purposefully overlooked his arthritic condition by not placing him on the chronic illness list, thus depriving Plaintiff of *free* medical treatment; 3) Plaintiff was denied medical treatment for twelve (12) days; and 4) Dr. Funk did not authorize a low gallery permit. (Plaintiff's Amended Complaint, Paragraphs 12, 17, 21, 22). The Plaintiff claims that as a result of Dr. Funk's alleged deliberate indifference, the plaintiff became psychologically disturbed, his brain wave activity was altered, and he suffered mental damage. Defendant Funk denies that Plaintiff was treated with deliberate indifference and that he was treated inappropriately in any way. Defendant Funk further denies that Plaintiff was injured or received any physical injuries as a result of the allegations made against Dr. Funk.

## Material Facts Claimed to be Undisputed

1. Andre Winston is currently incarcerated at the Pontiac Correctional Center. (Deposition of Andre Winston, Page 6, Lines 10-13, Exhibit 1, d/e 87.
2. Prior to arriving at Pontiac Correctional Center, Mr. Winston had received Motrin for his arthritic condition. (Deposition of Andre Winston, Page 9, Lines 11-15). This medication was discontinued on October 13, 2002. *See* Exhibit 2, d/e 87.
3. When Mr. Winston arrived at Pontiac Correctional Center on October 16 or 17, 2002, his medical records show that his prescription for Motrin was discontinued on October 13, 2002. Further, rheumatoid arthritis was not listed as significant medical history by the transferring facility. *See* d/e 87, Exhibit 2, Dr. Arthur D. Funk's Affidavit, Paragraphs 24- 25, Exhibit 3, d/e 87.
4. Mr. Winston's complaints against Dr. Funk relate solely to arthritis and his belief that he should have received free medical treatment (medical placement for the chronic illness clinic) and medication relevant to his arthritis. *See* Andre Winston's Deposition, Page 40, Lines 16-19, Page 69, Lines 16-18, Page 72, Lines 20-21.
5. When Inmate Winston first arrived at Pontiac Correctional Center, he did not know anything about the chronic illness list, but he learned about the clinic illness list, after his arrival in October 2002. *See* Andre Winston's Deposition, Page 34, Lines 1-3 and Page 32, Line 9.
6. In order to receive medical treatment, Inmate Winston understood that he had to follow proper protocol and that sending a letter directly to the Medical Director is not proper protocol. *See* Andre Winston's Deposition, d/e 87, Exhibit 1, Page 35, Lines 15-22, Page 64, Lines 6-15, Page 65, Lines 15-20.
7. Inmate Winston sent at least eight (8) letters directly to Dr. Funk, without following proper procedure. Dr. Funk responded to each one. *See* Dr. Funk Affidavit, Paragraphs, 29-32, 35, 36, 40.
8. Dr. Funk never personally examined Inmate Winston for his rheumatoid arthritis. *See* Dr. Arthur D. Funk's Affidavit, Paragraph 7.

9. Dr. Funk did not refuse to provide Mr. Winston with medical treatment. Dr. Funk indicated that Inmate Winston's condition was not a serious medical condition. *See* Andre Winston's Deposition, Page 36, Lines 13-18; Page 37, Lines 20-24, Page 39, Line 24, Page 40, Lines 1-10, and Dr. Funk's Affidavit, Paragraph 20.
10. On April 23, 2003, Dr. Funk reviewed Inmate Winston's grievance dated April 16, 2003. According to Inmate Winston's grievance, he stated that he has osteoarthritis and therefore requested "free" medical care. Dr. Funk advised the Grievance Committee that the medical co-payment applied for the plaintiff's requested medical service and osteoarthritis is not exempted from the medical co-payment. *See* Dr. Funk's Affidavit, Paragraph 33.
11. According to Inmate Winston's medical record dated April 24, 2003, Dr. Funk received a letter from Inmate Winston whereby he was complaining of bilateral knee pain. Dr. Funk then reviewed Plaintiff's previous labs and determined that Inmate Winston's labs were consistent with rheumatoid arthritis. At that time, Dr. Funk placed Mr. Winston on the General Medicine Clinic for autoimmune arthritis. *See* Dr. Funk's Affidavit, Paragraph 34 and Exhibit K, d/e 87-4.
12. Mr. Winston was treated in the General Medicine Clinic for his arthritic condition on May 20, 2003, was prescribed Motrin 600 mg for twenty-one (21) days, and was instructed to return every four (4) months. *See* Offender Outpatient Progress Note attached as Exhibit 4, d/e 87, and Prescription Order attached as Exhibit 5, d/e 87.
13. Following Mr. Winston's May 20, 2003 General Medicine Clinic visit, he knew that he was provided enough medication to last him twenty-one (21) days and that he did not have a refill. *See* Andre Winston's Deposition, Page 125, Lines 20-24; Page 126, Lines 1-7.
14. From April 24, 2003 through July 15, 2003, Dr. Funk had no contact with Inmate Winston, nor was he made aware of Inmate Winston's request for stronger pain medication during that time frame. *See* Andre Winston's Deposition, Page 31, Lines 2-4 and Dr. Funk's Affidavit, Paragraph 34.
15. On July 15, 2003, Dr. Funk received a letter from Inmate Winston dated July 14, 2003. According to Inmate Winston's letter, he requested that a doctor see him about his arthritis. Inmate Winston also stated that his requests in his P-96 were not addressed and that he wanted to be treated for his $2.00 payment. *See* Dr. Funk's Affidavit, Paragraph 35.
16. On July 15, 2003, Dr. Funk responded to Inmate Winston and advised him that medical complaints are individually assessed by the CMT staff and they include referral to sick call or treatment may be provided by a physician directed treatment protocol. Dr. Funk also advised Inmate Winston even though he is entitled to reasonable medical care, he cannot stipulate how this is to take place. Dr. Funk also indicated that it appeared that his P-96 was altered after it was submitted, and if that was the case, it should not have occurred. Dr. Funk then advised Inmate Winston that his co-payment had already been paid and since he was scheduled for the eye clinic today, July 15, 2003, Dr. Funk advised the clinic not to charge Inmate Winston for the eye examination. Dr. Funk also advised Inmate Winston that he is seen every four (4) months for his arthritis and there is no co-payment assessed for these scheduled visits. Last, Dr. Funk reminded Inmate Winston

that medical concerns are to be directed to his cell house CMT who will evaluate him for treatment or appropriately refer him. In the alternative, he may send a yellow "Medical Request" to the Health Care Unit. *See* Dr. Funk's Affidavit, Paragraph 36.

17. On July 16, 2003, Dr. Funk received a copy of Inmate Winston's grievance dated June 30, 2003, which claims he is not receiving free medical treatment because he is black. He also complains that his condition has been misdiagnosed. *See* Dr. Funk's Affidavit, Paragraph 37.

18. Following a review of Inmate Winston's medical records on July 16, 2003, Dr. Funk ordered Motrin 600 mg, to be taken as needed. Dr. Funk also ordered the CMT to deliver refills as needed until September 1, 2003. Dr. Funk further noted that Inmate Winston was scheduled for the General Medicine Clinic for rheumatoid arthritis in August 2003. *See* Dr. Funk's Affidavit, Paragraph 38.

19. On July 16, 2003, Dr. Funk also prepared a reply to the Grievance Committee based on Inmate Winston's grievance dated June 30, 2003. As indicated in his reply, Dr. Funk reviewed Inmate Winston's grievance and reviewed the applicable medical records. Public Act 91-912 states a medical co-payment is required for requested medical care. The medical file shows that Inmate Winston was enrolled in Chronic Clinic on April 24, 2003 for autoimmune arthritis. The administrative directive exempts this care from the medical co-payment. When seen in chronic clinic on May 20, 2003, medication was provided, but no refills were specified. Dr. Funk further advised the Grievance Committee that the physician who conducted Chronic Clinic was on prolonged vacation and was not available to respond, but Dr. Funk issued refills on July 16, 2003, to last Inmate Winston until the next Chronic Clinic. Dr. Funk further advised the committee that interruption in medication would not result in the concerns mentioned in Inmate Winston's June 30, 2003 grievance. There was no indication of discrimination in the care provided. *See* Dr. Funk's Affidavit, Paragraph 39; *see also* Exhibit P, d/e 87-5.

20. On July 18, 2003, Dr. Funk received a letter from Inmate Winston dated July 17, 2003, which claims that he wants stronger pain medication and a low gallery permit because the stairs hurt his knees. *See* Dr. Funk's Affidavit, Paragraph 40.

21. On July 18, 2003, Dr. Funk advised Inmate Winston to follow proper protocol when requesting medical treatment. *See* Dr. Funk's Affidavit, Paragraph 41; *see also* Exhibit R, d/e 87-5.

22. On August 24, 2003, Mr. Winston claims that his knees locked up when he was going up the stairs and that he started to fall backwards but was caught by a correctional officer. *See* Plaintiff's Amended Complaint, Paragraph 12; *see also* Andre Winston's Deposition, Page 63, Lines 4-8.

23. Mr. Winston did not receive any physical injury from the August 24, 2003 incident, and per a physician, other than Dr. Funk, Plaintiff's gait was normal without any limitations. *See* Andre Winston's Deposition, Page 63, Lines 9-11, and Dr. Funk's Affidavit, Paragraph 50.

24. Dr. Funk was not made aware of Mr. Winston's knees locking up until after the August 24, 2003 incident. *See* Andre Winston's Deposition, Page 63, Lines 18-22.

25. On September 1, 2003, Dr. Funk forwarded a reply to Inmate Winston regarding his letters dated August 25, 2003, and August 27, 2003, whereby Plaintiff requested that Dr. Funk order him a low gallery permit. *See* Dr. Funk's Affidavit, Paragraph 42).
26. In Dr. Funk's September 1, 2003 reply, Dr. Funk advised Inmate Winston that his medical file was reviewed and a lower gallery permit would not be medically necessary with his condition. Dr. Funk again reminded Inmate Winston that medical concerns are to be directed to his cell house CMT who would evaluate him for treatment or appropriately refer him to a physician or in the alternative, he may send a yellow "Medical Request" slip to the Health Care Unit. *See* Dr. Funk's Affidavit, Paragraph 43.
27. On September 11, 2003, Dr. Funk received a letter from Inmate Winston dated September 10, 2003 requesting he receive anti-inflammatory medication as opposed to pain medication, as well as a low gallery permit. *See* Dr. Funk's Affidavit, Paragraph 44.
28. On September 11, 2003, Dr. Funk advised Inmate Winston that his condition is known to cause discomfort and that available treatment modalities, including medication, will not completely eliminate arthritis pain and discomfort. Dr. Funk further advised him that activity is necessary despite initial discomfort and inactivity should be avoided. Dr. Funk then advised him that a low gallery permit was not part of his treatment. The response further states that his condition was monitored in Chronic Clinic which takes place approximately every four (4) months. Inmate Winston was last seen in the clinic on May 20, 2003. Last, Dr. Funk advised him that medical concerns are to be directed to his cell house CMT who will evaluate him for treatment or appropriately refer him. In the alternative, he may send a yellow "Medical Request" slip to the Health Care Unit. *See* Dr. Funk's Affidavit, Paragraph 45.
29. On September 24, 2003, Plaintiff was examined by a physician other than Dr. Funk and was found to be fully ambulatory and did not have restriction in range of motion or joint inflammation. Thus, Dr. Funk concluded that a lower gallery permit was not medically indicated and Inmate Winston did not have a medical reason that would cause instability for a fall. Inmate Winston's medical treatment was similar to what would be provided in the community. *See* Dr. Funk's Affidavit, Paragraphs 21, 47, 50; Andre Winston's Deposition, Page 38, Lines 9-12; Plaintiff's Amended Complaint, Paragraph 12.
30. Inmate Winston acknowledged that he has always been able to walk well and has never had to use any walking devices to assist him. *See* Andre Winston's Deposition, Page 14, Lines 10-14.
31. Mr. Winston did not want to have to pay the $2.00 co-payment, but acknowledged that if he would have paid the $2.00 co-payment, he still could have received medical treatment and could have dealt with the reimbursement/payment issue at a later time. *See* Andre Winston's Deposition, Page 41, Lines 5-7, Page 49, Lines 9-10.
32. Inmate Winston claims that Dr. Funk continued to deny his request for treatment, but admits that he does not have any evidence or proof that Dr. Funk knew every time he made a request to the CMTs. *See* Andre Winston's Deposition, Page 47, Lines 23-24; Page 48, Lines 1-8).
33. Even if Mr. Winston did not have the money to pay the $2.00 fee, he would not have been denied medical treatment. *See* Andre Winston's Deposition, Page 50, Lines 7-13.

34. Mr. Winston believes that he is entitled to something stronger than Motrin. *See* Andre Winston's Deposition, Page 51, Lines 2-4, 11-13, Page 72, Lines 5-9.
35. Mr. Winston acknowledges that the chronic illness list only entitles him to free treatment once every four (4) months. *See* Andre Winston's Deposition, Page 51, Lines 14-20.
36. Mr. Winston acknowledged that if he had any medical conditions within the four (4) month time frame following his May 20, 2003 General Medicine Clinic, then he would be required to pay according to protocol. *See* Andre Winston's Deposition, Page 52, Lines 4-7,Page 53, Lines 23 -24; Page 54, Lines 1-5.
37. Mr. Winston acknowledged that when his May 20, 2003 medication ran out, he did not request a refill, rather he requested something stronger than Motrin. *See* Andre Winston's Deposition, Page 55, Lines 19-24; Page 56, Lines 1-4.
38. Mr. Winston does not have any evidence to establish that, as of July 4, 2003, Dr. Funk was aware of his request for pain killers. (See Andre Winston's Deposition, Page 57, Lines 2-24; Page 58, Lines 1-9.
39. Inmate Winston first learned that he was on the chronic illness list the same day he flooded his cell and gallery, which took place on July 16, 2003. *See* Andre Winston's Deposition, Page 39, Lines 17-20.
40. Once Dr. Funk ordered the pain medication on July 16, 2003, Mr. Winston was not critical that it took two (2) days for him to receive the medication because that is standard procedure. *See* Andre Winston's Deposition, Page 59, Lines 13-24; Page 60, Lines 1-3.
41. Dr. Funk did not alter Mr. Winston's June 29, 2003 P-96 form. *See* Andre Winston's Deposition, Page 60, Lines 8-12.
42. Inmate Winston never saw Dr. Funk before he flooded his cell. *See* Andre Winston's Deposition, Page 69, Lines 21, 24; Page 70, Line1.
43. Mr. Winston claims that the CMTs did not give him his medication fast enough in that there was a fifteen (15) day delay. *See* Andre Winston's Deposition, Page 70, Lines 2-5. (In his Amended Complaint, the plaintiff alleges a twelve (12) day delay in Paragraphs 17, 21, and 22).
44. The medication that Inmate Winston believes he was going to receive during that fifteen (15) day time frame would have been Motrin. *See* Andre Winston's Deposition, Page 70, Lines 6-8.
45. Had Mr. Winston been given his medication, he would have been fine and would not have flooded his cell. *See* Andre Winston's Deposition, Page 70, Lines 9-13.
46. There were times when Inmate Winston refused treatment because he did not want to have to pay the $2.00 fee, and by refusing to pay the $2.00, Inmate Winston acknowledged that he cannot be placed on the list to be seen by a physician. *See* Andre Winston's Deposition, Page 70, Lines 14-23.
47. No medical doctor has criticized the care or treatment that Dr. Funk provided. *See* Andre Winston's Deposition, Page 71, Lines 4-7.
48. Mr. Winston wants his good time back and acknowledges that Dr. Funk has nothing to do with this request. *See* Andre Winston's Deposition, Page 71, Lines 12-16.
49. No medical provider has advised Mr. Winston that he is eligible for or needs a low gallery permit. *See* Andre Winston's Deposition, Page 71, Lines 19-21.

50.  Mr. Winston wants physical therapy and heat therapy. See Andre Winston's Deposition, Page 72, Lines 10-17; Page 30, Lines 15-16.
51.  Mr. Winston acknowledges that if he has three (3) separate medical conditions, then he has to pay for each one separately. *See* Andre Winston's Deposition, Page 126, Lines 14-17.
52.  On Mr. Winston's June 29, 2003 P-96 Form, he acknowledges that he listed three (3) separate conditions. In his deposition, the plaintiff acknowledges that he only authorized one $2.00 payment, and thus did not follow proper protocol. *See* Andre Winston's Deposition, Page 126, Lines 18-24, Page 127, Lines 1-2
53.  Inmate Winston is not claiming Dr. Funk caused him any physical injuries. *See* Andre Winston's Deposition, Page 41, Line 12-16.

## Discussion

In order to prove his cause of action, plaintiff must prove there was "deliberate indifference" to his serious medical needs. At a minimum, this requires actual knowledge of impending harm which is easily preventable, so that a conscious capable refusal to prevent harm can be inferred from the defendant's failure to prevent it. *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997); *Duckworth v. Franton*, 780 F.2d 645, 653 (7th Cir. 1985). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970 (1994). In *Farmer*, the court concluded that deliberate indifference was essentially a criminal recklessness standard, that is, ignoring a known risk. *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). The deliberate indifference standard applies when prison medical personnel make decisions as to what medical care a person requires. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976); *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). To prove deliberate indifference, the doctor must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and that he must actually draw the inference. *Higgins v. Correctional Medical Servs.*, 178 F.3d 508, 511 (7th Cir. 1999). A complaint that a physician has negligently diagnosed a medical condition does not state a cause of action for violation of the prisoner's constitutional rights. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285 (1976). Moreover, it is not enough to simply assert that the doctor should have known of the risks. Higgins, 178 F.2d at 511.

Furthermore, a disagreement or dissatisfaction with the method treatment does not constitute an Eighth Amendment claim of deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 591-92 Cir. 1996). Medical decisions, such as whether one course of treatment is preferable to another, is beyond the purview of the Eighth Amendment. Such matters are questions of tort, not constitutional law. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). The Constitution is not a medical code that mandates specific medical treatment. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

The Plaintiff alleges deliberate indifference on the part of Dr. Funk. More specifically, the Plaintiff claims Dr. Funk purposefully ignored his medical needs by failing to place him on the "chronic illness list" when he was first transferred to Pontiac Correctional Center, which would have entitled him to *free* medical treatment at the General Medicine Clinic once every four (4) months. The Plaintiff also claims that Dr. Funk failed to authorize a low gallery permit. Plaintiff, however, does not allege Dr. Funk denied him medical treatment; he just claims that he should not have had to pay $2.00 for *any* treatment relating to his arthritic condition. The Plaintiff's medical records and deposition testimony establish that the Plaintiff received proper medical treatment for his arthritis. Not once did Dr. Funk deny Plaintiff medical treatment or pain medication relevant to the Plaintiff's arthritis. There were times, as admitted by the Plaintiff, that he did not follow proper protocol and, therefore, did not receive the requested medical treatment. However, when Plaintiff did follow proper protocol, he was placed on sick call and either evaluated and/or received pain medication for his arthritis.

The Plaintiff claims that he should have been placed on the "chronic illness list" when he first arrived at Pontiac Correctional Center in late October 2002. Dr. Funk placed the Plaintiff on the chronic illness list (a/k/a "General Medicine Clinic") on April 24, 2003 following his review of the Plaintiff's lab results. The Plaintiff was treated during that time frame (October 2002 - April 2003) for his complaints of joint pain and received pain medication as illustrated in his medical records. This treatment and related medication, however, was not provided *free of charge* until his first official visit to the General Medicine Clinic - May 20, 2003. The Plaintiff has not established any physical injury as a result of not being placed on the chronic illness when he first arrived at Pontiac Correctional Center. The only alleged "harm" he suffered was that he had to pay for his medical treatment. The Plaintiff admitted, however, that had he paid the $2.00, he would have received medical treatment and/or medications for this arthritis when he requested it and could have dealt with the reimbursement issue at a later time.

The Plaintiff also alleges he was denied treatment for fifteen (or twelve) days. As indicated in the medical records, the Plaintiff was seen in the General Medicine Clinic on May 20, 2003. He was not entitled to another *free* visit until four months later. The physician who examined him on May 20, 2003 prescribed pain medication for his arthritis. This medication was to last for approximately one (1) month and did not come with a refill. According to the Plaintiff's testimony, he knew that if he wanted additional medication, he would have to fill out a request to be seen by a physician. When the Plaintiff requested a refill from the CMT, he was advised that there were no refills indicated. The Plaintiff then filled out a P-96 Form and indicated he wanted medicine for his throat infection, his eye irritation, and he also wanted *stronger* medicine for his joint pain. The Plaintiff only authorized a debit of $2.00 from his trust account. The Plaintiff testified that he is familiar with the protocol that requires a $2.00 deduction for *each* complaint/medical need. Thus, the Plaintiff admitted that he should have authorized a $6.00 deduction, which he did not do. On July 15, 2003, Dr. Funk received a letter directly from the Plaintiff. This is also the first time Dr. Funk was made aware that there was an issue regarding the Plaintiff's June 29, 2003 P-96 form. The Plaintiff admitted that Dr. Funk did not alter this P-96 form and further acknowledged that he has no evidence or information that Dr.

Funk was aware of his complaints surrounding the P-96 form prior to him bringing it to Dr. Funk's attention. In Dr. Funk's response, he advised the Plaintiff that since the $2.00 was already deducted from his account, he would instruct the healthcare unit not to charge Mr. Winston for his eye appointment, which was already scheduled for July 15, 2003. Dr. Funk also advised the Plaintiff that he was on the chronic illness list. The Plaintiff claims this is the first time he became aware that he was on this list.

The Plaintiff flooded his cell and the gallery on July 16, 2003. On that same day, Dr. Funk received the Plaintiff's grievance dated June 30, 2003. Following Dr. Funk's review of this grievance, he ordered Motrin 600 mg, to be taken as needed. This prescription was to last until the time of the next General Medicine Clinic. The Plaintiff also claims that Dr. Funk failed toprovide him with a low gallery permit. The Plaintiff, however, admitted that no medical physician has told him that his arthritic condition qualifies him for a low gallery permit. The Plaintiff further acknowledged that no physician has criticized Dr. Funk's decision not to order the Plaintiff a low gallery permit. Further, per Dr. Funk's affidavit, Dr. Funk did not and does not consider the Plaintiff's arthritis to be an emergent condition. The Plaintiff's rheumatoid arthritis was a common medical condition, and therefore, was not considered a serious medical need which placed the Plaintiff at a serious risk of harm. Moreover, Dr. Funk concluded that the Plaintiff's request for a low gallery permit was appropriately denied because a low gallery permit is not part of the treatment plan for rheumatoid arthritis, and as illustrated by Dr. Funk's review of Plaintiff's medical records, Plaintiff's gait was normal; he had no swelling and no limitations. The Plaintiff also acknowledged that he has always walked well and has never had to use walking devices to assist him.

The Plaintiff has failed to meet his first burden of proof in establishing that he suffered from a serious medical need that required different treatment. Even if this court accepts the Plaintiff's claim that he had a serious medical need, he has failed to establish that he suffered any physical injury as a result of: 1) not being placed immediately on the chronic illness list; 2) not receiving a refill of medication for fifteen (15) days, and 3) not receiving a low gallery permit. The Plaintiff also does not have any evidence that Dr. Funk "purposefully" neglected his "serious" medical need. To the contrary, as illustrated in Dr. Funk's affidavit (and the exhibits attached thereto), in addition to the Plaintiff's medical records, Dr. Funk timely responded to the Plaintiff's medical needs and complaints as soon as he was made aware of them. Accordingly, Plaintiff has failed to prove the subjective element of his claim for deliberate indifference.

Moreover, Dr. Funk never personally examined the Plaintiff during the time frame alleged in his Amended Complaint. Although Dr. Funk never personally examined the Plaintiff, he did have occasions to review the Plaintiff's medical records, correspondence, and grievances, and is of the opinion that the Plaintiff was treated appropriately and was given all medications as was medically necessary to treat his condition; all treatment provided to the Plaintiff was in accordance with medical standards, judgment, and training; and where an inmate is entitled to reasonable care, he cannot dictate how that treatment is to occur.

Finally, *see Reynolds v. Wagner*, 128 F.3d 166, 174 (3rd Cir.1997) (prisoner co-payment plan does not violate the Eighth Amendment); *Shapley v. Nevada Bd. of State Prison Commissioners*, 766 F.2d 404, 408 (9th Cir.1985) (nothing per se unconstitutional about charging an inmate $3 for every medical visit; such a charge, by itself, did not constitute deliberate indifference under Estelle); *See also Hudgins v. DeBruyn*, 922 F.Supp. 144, 150-52 (S.D.Ind.1996) (same); *Martin v. DeBruyn*, 880 F.Supp. 610, 615 (N.D.Ind.1995), aff'd, 116 F.3d 1482 (7 th Cir.1997) (Eighth Amendment guarantees only that inmates receive necessary medical care; it does not guarantee free medical care).

**It is therefore ordered:**

1. **Pursuant to Fed. R. Civ. P. Rule 56(c), Defendant Arthur Funk's summary judgment motion, d/e 87, is allowed.  The clerk of the court is directed to enter judgment in favor of the Defendants, Dr. Funk, and against the plaintiff at the conclusion of this lawsuit.**
2. **As a result of the foregoing, the Plaintiff's summary judgment motions as to Defendant Arthur Funk, d/e 98 and 106, are denied as moot.**
3. **If the plaintiff wishes to appeal this ruling, he may file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  See Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $255.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**

**Enter this 20th  day of March 2006.**


                              s\Harold A. Baker
                              _____
                              **HAROLD A. BAKER**
                              **UNITED STATES DISTRICT JUDGE**